UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

DEVON SINCLAIR,

                    Defendant.

_____

<u>DECISION & ORDER</u> and
<u>REPORT & RECOMMENDATION</u>

10-CR-6211L

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated

December 14, 2010, all pretrial matters in the above-captioned case were referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 67).  Defendant Devon Sinclair

("Sinclair") has been charged with conspiracy to possess with intent to distribute and to distribute

one hundred or more kilograms of marijuana, in violation of 21 U.S.C. § 846.  (Docket # 1).

Currently pending before the Court are Sinclair's motions to suppress physical

evidence, statements and evidence of two photographic identifications.  (Docket ## 47, 59).  On

June 3, 2011, this Court conducted an evidentiary hearing on the suppression motions.  (Docket

## 81, 91).  For the reasons discussed below, I recommend that the district court deny Sinclair's

motions to suppress statements and evidence of photographic identifications.  As to the physical

evidence, this Court shall conduct a further hearing before making a recommendation on that

motion.

<u>**FACTUAL BACKGROUND**</u>

**I.  <u>March 24, 2009 Identification Procedure</u>**

Andrew Woeppel ("Woeppel") testified that he had been employed as an agent with the Drug Enforcement Administration ("DEA") for approximately six years.  (Tr. 5).[1]  On March 24, 2009, he and federal agents Brian Hanley and Anthony Patrone conducted a photographic identification procedure as part of a marijuana trafficking investigation in which he was involved.  (Tr. 34).  According to Woeppel, that afternoon they met with a confidential informant in Patrone's car.  (Tr. 34-35).  Woeppel testified that he asked the informant to review a binder of photographs and to indicate whether he or she recognized any of the individuals depicted in the photographs.  (Tr. 35-36).  Woeppel further testified that the informant was instructed "to put his name or initials and what he knows that individual by, what name he knows what picture."  (Tr. 36).

During his review of the binder, the informant identified two of the individuals depicted in the photographs.  (Tr. 40-41).  One was a photograph of Sinclair.  (Tr. 40, 52-53).  According to Woeppel, when the informant reached that photograph, "he kind of tapped the photo with his finger and said 'this guy is . . . Clive or Fat Clive or Big C' or something to that effect, Big Clive."  (Tr. 40).  He also stated that Big Clive was a marijuana dealer in Rochester, New York, who obtained "crates of marijuana" from Tucson.  (Tr. 40-41).  The informant then initialed, dated and wrote "big Clive" under the photograph.  (Tr. 40; G. Ex. 3).  Woeppel testified that the agents did not debrief or question the informant about the investigation before

---

[1]  The transcript of the June 3, 2011 hearing shall be referred to as "Tr. __."  (Docket # 91).

showing him the binder of photographs and the meeting ended shortly after the identification procedure. (Tr. 52, 54).

The binder contained copies of thirty-three black and white photographs of twenty-two different African-American men and eleven different women, some of whom were targets of the investigation. (Tr. 35, 50; G. Ex. 3). Each page of the binder contained only one photograph, and the photographs were separated by gender. (Tr. 37; G. Ex. 3). All of the male photographs are head shots of African-American men of varying ages and features. (G. Ex. 3). Sinclair's photograph, the nineteenth in the binder, depicts a man with a large, round face, short hair and a short mustache and beard, who appears heavyset. (*Id*.). Several other photographs are of men with similar characteristics. (*Id*.).

## II. July 7, 2009 Identification Procedure

Woeppel testified that he and Agent Hanley conducted another photographic identification procedure with a different informant on July 7, 2009. (Tr. 41). On that occasion, he and Hanley met with the informant in an interview room in the DEA's Rochester office. (Tr. 42). Woeppel could not remember if any other law enforcement agents were present. (*Id*.). The informant was presented with a binder containing copies of the same photographs displayed in the March procedure and told, "we would like to show you some photographs, let us know if you recognize any of these people, take your time." (Tr. 42-43; G. Ex. 3, 4). The informant looked at all the photographs and identified three individuals, including Sinclair. (Tr. 43-44, 46). The informant identified him as "Clive" and wrote that name, along with the informant's initials and date, next to the defendant's photograph. (Tr. 45; G. Ex. 4). Like the previous informant, this

informant also reported that Clive was a marijuana dealer whose activities included receiving crates of marijuana from Tucson. (Tr. 46). Neither agent said anything to the informant while he was reviewing the binder other than to give him instructions about how to record his identification on any photograph he recognized. (Tr. 45-46).

Woeppel testified that he and other agents had several meetings with the informant during the course of the investigation, and he could not remember when during the sequence of those meetings the identification procedure occurred. (Tr. 58-59). Woeppel further testified that prior to the informant's identification of the defendant's photograph, the defendant's name had not been mentioned during that meeting. (Tr. 55).

## III. November 10, 2010 Arrest and Search

Woeppel also testified about Sinclair's arrest, the search of his business and statements he made after his arrest. (Tr. 6-34, 59-77). According to Woeppel, on November 10, 2010, at approximately 9:30 a.m., he and an arrest team of approximately eight agents executed an arrest warrant for Sinclair at his automobile mechanic business located at 207 Lyell Avenue in Rochester, New York. (Tr. 6-7, 13, 59). The premises consisted of two adjoining spaces in one building – an open garage and an adjoining office. (Tr. 60-61). The garage was small and contained two car lifts, vehicles, engine blocks, vehicle parts, and other garage equipment and property. (Tr. 10, 12, 61, 64). Woeppel testified that many of the items in the garage were large enough for an individual to hide in or behind. (Tr. 10, 64).

With their guns drawn, Woeppel and the arrest team entered the premises through a door that led into the open garage. (Tr. 8-10, 60-61). Upon entering the premises, the agents

4

quickly apprehended and handcuffed Sinclair, who was located just inside the door that the officers had entered, in an area near the threshold between the office and the garage bay. (Tr. 8-9, 60-61). The agents immediately conducted an "initial sweep" of the garage. (Tr. 9-10). The purpose of the initial sweep, according to Woeppel, was to identify "any immediate threats – that could be people, dogs, booby traps, that kind of thing." (Tr. 10). Within seconds, the agents located and detained another individual who was between the two car lifts in the garage bay. (Tr. 8, 10, 62). The individual did not appear to have been hiding. (Tr. 62).

Immediately after detaining Sinclair and the other individual, the agents holstered their guns and began a "secondary" sweep by looking behind objects to determine whether any individuals were hiding in the garage. (Tr. 10-12, 63-64). Woeppel testified that the agents conducted this phase of the sweep in pairs and confined their search to areas where an individual could have been hiding. (Tr. 11-12).

During this second phase, another agent observed and seized a bag of marijuana. (Tr. 12, 65). According to Woeppel, the marijuana was resting on some open shelves or a red tool chest on the shelf. (*Id*.). Woeppel also testified that the marijuana was in plain view and could be seen from where the agents were positioned during the sweep. (Tr. 12-13). On cross-examination, however, Woeppel admitted that he was not certain where the marijuana had been located because he was not the agent who had recovered the marijuana. (Tr. 65-66).

After the agents had completed the security sweep of the garage, Woeppel and Hanley introduced themselves to Sinclair and explained that they had a warrant for his arrest. (Tr. 13). At the time, Sinclair was in handcuffs and standing in the area where he had originally been detained by the agents. (*Id*.). The agents requested Sinclair's consent to "look around" the

garage.  (Tr. 13-14).  Woeppel testified that Sinclair verbally consented to the search.  (Tr. 14).

Hanley then presented a DEA "Consent to Search" form to Sinclair, which contained three

pre-printed statements:

> 1.    I have been asked to permit special agents of the Drug
>        Enforcement Administration to search: (Describe the
>        person, places, or things to be searched.)
>
> 2.    I have not been threatened, nor forced in any way.
>
> 3.    I freely consent to this search.

(Tr. 14-15; G. Ex. 1).

Woeppel testified that Hanley explained the consent form to Sinclair.  (Tr. 15-16).

Woeppel completed the section identifying the area to be searched by handwriting the words

"Pro Auto, 207 Lyell Avenue, Rochester, New York."  (Tr. 16).  Sinclair, Woeppel and Hanley

each signed the form.  (Tr. 17, 19).  Woeppel testified that his request for consent did not identify

any particular area of the premises they wished to search and Sinclair never told the agents that

they could not search any specific area, including the office.  (Tr. 66-67, 75-76).

According to Woeppel, the agents spoke to Sinclair in a conversational tone, and

Sinclair was very cooperative and did not appear to be under the influence of alcohol or drugs.

(Tr. 18, 20, 69).  At no time did Sinclair indicate that he did not understand the agents'

statements and questions.  (Tr. 18).  Woeppel testified that none of the agents made any promises

or threats to Sinclair in order to obtain his consent.  (Tr. 18-19).

After Sinclair executed the written consent form, the agents conducted a search of

both the office and the garage.  (Tr. 20).  In the office, agents located and seized an unspecified

amount of currency, documents and a cell phone.  (Tr. 23).  From the garage area, agents located and seized a number of small plastic bags.  (Tr. 23, 70).

## IV.  Post-Arrest Statements

Following Sinclair's arrest, Woeppel transported him to the Rochester DEA office, where Woeppel and another DEA agent questioned him in an interview room.  (Tr. 24-26).  Before beginning the questioning, the agents removed Sinclair's handcuffs, and Woeppel read aloud the *Miranda* warnings using a DEA form.  (Tr. 25; G. Ex. 2).  Woeppel testified that he asked Sinclair if he understood his rights, and Sinclair responded that he did.  (Tr. 28).  Sinclair also responded affirmatively when Woeppel asked him if he wished to speak to Woeppel.  (Tr. 29).  The interview lasted approximately thirty-five or forty minutes, during which Sinclair responded to the agents' questions and never asked to stop the interview or to consult with an attorney.  (Tr. 30-31, 33, 73).  Neither agent threatened or promised anything to Sinclair or displayed his weapon during the interrogation.  (Tr. 32-33).  Woeppel testified that he probably advised Sinclair that "in [his] experience, people that cooperate generally end up better off than someone who doesn't," although he made no representations about the specific benefits of cooperating.  (Tr. 73-75).

**V.  Sinclair's Affidavit**

In support of his suppression motions, Sinclair submitted an affidavit in which he stated that when he was arrested he consented to a search only of his office, but not of any other areas of the garage.  (Docket # 47-7 at ¶¶ 5-6).  Sinclair also stated that he has no recollection of being advised of or waiving his *Miranda* rights.  (*Id*. at ¶ 13).  Finally, he claims that he was not "permitted an opportunity to call an attorney."  (*Id*. at ¶ 12).

**DISCUSSION**

**I.  Motion to Suppress Photographic Identifications**

I turn first to Sinclair's motion to suppress evidence of the two photographic identifications.  (Docket # 59).

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive.  *Id*.  To decide whether a photographic array is unduly suggestive, a court should consider several factors including "the size of the array, the manner of presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must consider "whether the picture of the accused . . . so stood out from all the other photographs as to

suggest to an identifying witness that [the accused] was more likely to be the culprit." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability."[2] *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977). "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

On the record before the Court, I find that neither of the identification procedures at issue was unduly suggestive. Both witnesses were presented with a binder containing copies of thirty-three black and white photographs and asked to identify anyone whom they recognized and to record the identification on the photograph. No other instructions were given. In neither identification procedure was the witness advised that the purpose of the meeting was to determine if the witness could identify the defendant. According to Woeppel, the binder contained photographs of various targets of the investigation and others with no connection to the investigation – twenty-two were pictures of different African-American men and eleven were pictures of women. Each page of the binder contained a single photograph, and the defendant's

---

[2] At the government's request, this Court bifurcated the *Wade* hearing and examined only whether the procedure was unduly suggestive.

photograph was the nineteenth of the twenty-two male photographs.  Sinclair's photograph, like

the others in the binder, is a frontal image from the neck to the top of his head.  While the men

depicted in the binder are of varying ages and features, many have facial features and hairstyles

similar to Sinclair's.  On this record, I do not find that Sinclair's photograph "so stood out from

all of the other photographs as to suggest to [the] identifying witness that [he] was more likely to

be the culprit." *Jarrett v. Headley*, 802 F.2d at 41 (internal quotations omitted).  *See*, *e.g.*, *United

States v. Thai*, 29 F.3d 785, 809 (2d Cir.) (book of photographs not unduly suggestive where it

contained approximately fifty photographs of Asian males with varying hairstyles and facial

hair), *cert. denied*, 513 U.S. 977 (1994); *Jones v. Conway*, 2011 WL 1356751, *5 (W.D.N.Y.

2011) (identification procedure not unduly suggestive where witness was shown approximately

fifty photographs of African-American males; "sheer number of photographs makes the danger

of misidentification minimal"); *United States v. James*, 415 F. Supp. 2d 132, 167 (E.D.N.Y.

2006) (procedure of showing witness five photographs serially (one for each defendant) not

unduly suggestive); *United States v. Sosa*, 2006 WL 120042, *3 (E.D. Pa. 2006) (presentation of

twenty photographs in book not unduly suggestive).

   In sum, because I find that the identification procedure and the array itself were

not unduly suggestive, I recommend denial of Sinclair's motion to suppress evidence of the

identifications.


## II.  <u>Motion to Suppress Physical Evidence</u>

   I turn now to Sinclair's motion to suppress the evidence seized on November 10,

2010 from 207 Lyell Avenue, Rochester, New York, an automobile garage that he owned.

(Docket # 47). Because the evidence was seized from Sinclair's place of business after the agents conducted a warrantless search, the legality of the seizure turns on whether a valid exception to the warrant requirement existed. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)). In this case, the government argues that the seizure was permissible under two different exceptions. (Docket # 105). First, the government maintains that the marijuana was properly seized in plain view, *see Horton v. California*, 496 U.S. 128, 136-37 (1990), during the course of a lawful security sweep of the garage, *see United States v. Moran Vargas*, 376 F.3d 112, 115 (2d Cir. 2004) (citing *Maryland v. Buie*, 494 U.S. 325, 333-34 (1990)). Alternatively, the government contends that Sinclair voluntarily consented to the search of the premises, during which the currency, records, cell phone and baggies were seized and the marijuana inevitably would have been discovered and seized. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996).

### A. Legality of Security Sweep

Sinclair contends the search during which the marijuana was discovered was unlawful because the government failed to identify any facts to show that the agents had reason to believe dangerous persons were likely hidden within the premises. (Docket # 95 at 4). According to the defendant, even if the initial sweep were lawful, the secondary sweep was not because the agents had already completed the initial sweep and had no reason to remain inside the premises. (*Id*.). The government counters that the initial sweep was a permissible protective sweep for officer safety and was properly conducted incident to Sinclair's arrest without the need for reasonable suspicion. (Docket # 105 at 13-16). Further, the government maintains, the

11

secondary sweep was merely a lawful continuation of the permissible security sweep, and the marijuana was lawfully observed in plain view during the scope of that sweep. (*Id*.).

The Supreme Court has articulated three types of permissible warrantless searches that may be conducted by officers during the course of an in-premises arrest. *See United States v. Moran Vargas*, 376 F.3d at 115 (citing *Maryland v. Buie*, 494 U.S. at 333-34). First, in order to execute an arrest warrant, "officers are 'entitled to enter and to search anywhere in the house in which [the arrestee] might be found.'" *Id*. (quoting *Buie*, 494 U.S. at 333) (alterations in original). Second, considering the inherent dangers that arise from "taking an individual into custody, officers are automatically justified in searching as 'an incident to the arrest' the area adjoining the place of arrest 'from which an attack could be immediately launched.'" *Id*. (quoting *Buie*, 494 U.S. at 334). Finally, officers may expand this protective sweep to additional areas within the premises, but only if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. (quoting *Buie*, 494 U.S. at 334).

A "security" or "protective" sweep incident to an in-premises arrest is limited in scope and must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (quoting *Buie*, 494 U.S. at 327). Because a protective sweep is justified by the need to protect the arresting officers from the dangers posed by arresting a suspect on his or her "turf," this sweep may be performed "as a precautionary matter and without probable cause or reasonable suspicion." *Buie*, 494 U.S. at 333-34. Agent must possess "articulable facts" suggesting that the

premises harbors a dangerous individual, however, in order to extend the sweep beyond areas immediately adjoining the arrest. *United States v. Lauter*, 57 F.3d 212, 216 (2d Cir. 1995). Thus, when officers execute an arrest warrant in a small apartment or premises, they generally will be entitled to perform a cursory sweep of the entire premises; by contrast, when they execute an arrest warrant in a larger premises, they will need reasonable suspicion to believe that dangerous persons are present in order to sweep the entirety of the premises or to expand the search to separate floors of a premises. *Compare United States v. Alejandro*, 100 F. App'x 846, 848 (2d Cir.) (inspection of closet in small apartment was within scope of protective sweep; "[p]articularly when a district court finds that an apartment is small, an immediately adjoining room is searchable under the 'protective sweep' exception"), *cert. denied*, 543 U.S. 907 (2004); *United States v. Lauter*, 57 F.3d at 217 (sweep of adjoining back room was within scope of permissible protective sweep "in light of the small size of the apartment"); *United States v. Lucas*, 817 F. Supp. 2d 151, 163 (W.D.N.Y. 2010) (sweep of adjoining bedroom in small apartment was within scope of permissible protective sweep), *aff'd*, 462 F. App'x 48 (2d Cir. 2012); *United States v. Big Apple Bag Co.*, 317 F. Supp. 2d 181, 189-90 (E.D.N.Y. 2004) (sweep of 6,000-10,000 square foot warehouse was within scope of permissible protective sweep considering the open nature of the warehouse space and the presence of rows of boxes behind which person could have been hiding) *with United States v. Zubiate*, 2009 WL 483199, *4 (E.D.N.Y. 2009) (reasonable articulable suspicion needed to expand protective sweep to second floor); *United States v. Rudaj*, 390 F. Supp. 2d 395, 400-01 (S.D.N.Y. 2005) (reasonable articulable suspicion needed to expand protective sweep to second floor), *aff'd sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 1749 (2010).

In this case, Sinclair's business premises consisted of two adjoining spaces – an open garage and an office – both of which were described as small. The office was located immediately to the left of the entrance to the garage; the garage had two car lifts and, at the time of the search, contained vehicles, as well as garage equipment, such as engine blocks, transmissions and other car parts. After entering the garage to execute the arrest warrant, the agents immediately encountered and detained Sinclair near the threshold between the office and the garage bay. Because of the small size of the premises, Sinclair's presence on the threshold between the bay and the office and the presence of automobiles, equipment and property in or behind which other persons could hide, I find that the officers were entitled to conduct a security sweep of the garage and adjoining office "as a precautionary matter and without probable cause or reasonable suspicion." *See Lauter*, 57 F.3d at 216-17 (agents permitted to perform security sweep of entire two-room apartment without showing of reasonable suspicion) (quoting *Buie*, 494 U.S. at 334); *see United States v. Big Apple Bag Co.*, 317 F. Supp. 2d at 188-89 (security sweep of warehouse space justified without showing of reasonable suspicion); *United States v. Lucas*, 817 F. Supp. 2d at 163 (security sweep of all adjoining rooms in apartment justified without showing of reasonable suspicion).

The fact that the agents continued to sweep the garage after they had handcuffed Sinclair and the other individual does not transform the permissible security sweep into an impermissible search. Although a security sweep incident to an arrest may not extend indefinitely, the agents must be permitted to conduct an adequate sweep to ensure their safety. *See Buie*, 494 U.S. at 334 ("the arresting officers are permitted . . . to take reasonable steps to ensure their safety after, and while making, the arrest"). In this case, the agents were permitted to

complete a security sweep of the garage in order to protect themselves from danger as they were completing the arrest of Sinclair and preparing to leave the premises with him in custody. *See United States v. Lemus*, 582 F.3d 958, 964 (9th Cir. 2009) ("[a]lthough . . . the police officers could have left the premises immediately after the arrest, this fact does not make the search of the living room any less necessary – there was no guarantee that a potential attacker would not ambush the officers after they had turned their backs to the door"), *cert. denied*, 131 S. Ct. 129 (2010); *see United States v. Thomas*, 429 F.3d 282, 288 (D.C. Cir. 2005) (security sweep permitted after detaining target in order to complete arrest and allow officers to exit premises safely), *cert. denied*, 549 U.S. 1055 (2006).

After detaining Sinclair and the other individual, the agents began to look in and behind objects in the garage where persons could have been hiding. The bag of marijuana was found during this phase. Although Woeppel described this inspection as a "second sweep," the evidence demonstrates that it was actually a continuation of the permissible sweep incident to arrest. As Woeppel explained, the "initial" seconds-long sweep merely involved a scan for any conspicuous threats to the agents' safety, such as dogs, persons readily observable or booby traps, while the second phase involved a closer sweep to look for persons who may have been hiding and could have assaulted or threatened the officers. Although the agents holstered their guns during the second phase, Woeppel testified that the agents conducted that part of the sweep in pairs in order to promote safety. Finally, although the record is not absolutely clear as to the timing of this second phase, the reasonable inference from the testimony is that the sweep was a fluid event with no break between the first and second phases. (Tr. 63 "[The second phase] just

kind of happens. You just kind of go in the second sweep mode and you just take a closer look at everything.").

On this record, I find that the agents conducted a permissible security sweep by looking for, in the first instance, obvious dangers and then sweeping more thoroughly to look for persons who might have been hiding in and behind cars and other property in the garage.

### B. Plain View

Pursuant to the plain view doctrine, an agent may lawfully seize items of evidentiary value if he has a legitimate right to be in the location from which the item is observed, the item's incriminating nature is obvious and the officer has a lawful right of access to it. *See Horton v. California*, 496 U.S. at 136-37; *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). In this case, the agents' seizure of the marijuana turns on whether they observed it in plain view from a lawful vantage point during the course of the security sweep. In making this assessment, the court must be cognizant that although the agents were permitted to sweep the entire garage (considering its small size), the scope of their search was limited to "a cursory inspection of those spaces where a person may be found." *United States v. Blue*, 78 F.3d 56, 60 (2d Cir. 1996) (quoting *Buie*, 494 U.S. at 355).

In my view, the record does not adequately establish whether the bag of marijuana was observed in plain view during the course of the security sweep. Although Woeppel testified that he believed the bag of marijuana was discovered in plain view, he was not the officer who discovered it. He could not testify with certainty as to the location of the marijuana when it was found. Specifically, he stated on cross-examination, "I believe it was resting on the shelf, although I did not recover it so I can't be sure." (Tr. 66). Nor is there testimony as to the

16

location of the agent was when he or she found it, the location of the shelves in the garage and the observations the agent made about the bag and its contents.

## C. <u>Validity of Consent</u>

The need to further develop the record on the issue of plain view may be obviated, however, if the record demonstrates that Sinclair validly consented to a search of his garage and that the marijuana would have been inevitably discovered in the course of that subsequent consent search. Sinclair challenges the validity of his consent on three different grounds. First, Sinclair contends that his consent was tainted by the illegal search and seizure of the marijuana during the course of the security sweep. Second, Sinclair contends that his consent was not voluntary. Finally, Sinclair contends that he consented to a search only of the office, and not the entire garage.

Consent obtained after an unlawful search and seizure may be invalidated as the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990) (applying fruit of poisonous tree doctrine to consent following illegal seizure). In this case, if the marijuana's seizure during the security sweep was unlawful, then Sinclair's subsequent consent may be invalidated unless the government can prove that the taint of the illegal seizure had dissipated. *See United States v. Oguns*, 921 F.2d at 447. Stated another way, "[t]he government must show that the consent was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id*. (internal quotations omitted).

Four considerations generally inform the attenuation assessment: "whether a *Miranda* warning was given, the 'temporal proximity' of the illegal entry and the alleged

17

consent, 'the presence of intervening circumstances,' and 'the purpose and flagrancy of the official misconduct.'" *Id*. (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). In addition, the court should also consider whether the officers exploited the tainted evidence in order to induce consent. *United States v. Tortorello*, 533 F.2d 809, 814 (2d Cir.) ("the procurement of a 'voluntary' consent to search based upon a prior illegal search may taint the consent"), *cert. denied*, 429 U.S. 894 (1976); *United States v. Barone*, 721 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) (noting that agents confronted defendant with evidence seized in illegal search in effort to obtain defendant's consent for further search).

Unfortunately, the record is also insufficiently developed for the Court to evaluate the validity of Sinclair's purported consent. Specifically, the record contains no evidence whether the agents had discussed the seizure of marijuana with Sinclair in requesting his consent or whether Sinclair otherwise had been aware of it before giving consent. *See United States v. Isiofia*, 2003 WL 21018853, *4 & n.8 (S.D.N.Y. 2003) (consent obtained after illegal government action must be both voluntary and not exploitation of prior illegality), *aff'd*, 370 F.3d 226 (2004).

Considering the open factual questions on both the issues of plain view and consent, a hearing shall be conducted on **November 20, 2012**, at **2:00 p.m.**, to further develop the record.

III.  **Motion to Suppress Statements**

Finally, I turn to Sinclair's motion to suppress statements he made during an interview with Woeppel and another agent following his arrest on November 10, 2010. (Docket

18

# 47).  In his affidavit, Sinclair alleges that he does not recall being advised of his *Miranda* rights before he was questioned and he was not afforded an opportunity to contact an attorney.  (Docket # 47-7 at ¶¶ 12-13).  The government opposes his motion, contending that Sinclair's statements were properly obtained.  (Docket # 105).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [him] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).  To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The record before the Court demonstrates that Sinclair was advised of his *Miranda* rights and voluntarily waived them before answering the agents' questions.

Specifically, Woeppel testified that after placing Sinclair in an interview room at the DEA's Rochester office, he removed Sinclair's handcuffs and then read aloud to him the *Miranda* warnings from a rights card and asked Sinclair whether he understood the rights. Sinclair responded that he did and agreed to speak to the agents. Sinclair showed no signs of intoxication or illness during the interview, nor did he request an attorney or that the questioning cease. The record further establishes that the agents did not threaten or make any coercive promises to Sinclair in order to induce him to speak. *See*, *e.g.*, *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive . . . [and] are merely common sense factual observations") (internal citations omitted), *cert. denied*, 516 U.S. 1182 (1996); *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) ("there is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him") (quoting *United States v. Jaswal*, 47 F.3d at 542).

On this record, I find that Sinclair was properly advised of his *Miranda* rights and knowingly and voluntarily waived those rights before being subjected to custodial interrogation. I further credit Woeppel's testimony that Sinclair never requested to consult with an attorney during the interview. Accordingly, it is my recommendation that Sinclair's motion to suppress his post-arrest statements be denied.[3]

---

[3] Sinclair does not argue that his statements should be suppressed as fruit of the allegedly illegal garage search. In any case, Sinclair was read his *Miranda* warnings before being questioned, explicitly waived his rights, was questioned at a location and time removed from the alleged illegal search; moreover, the record is devoid of any evidence that the agents engaged in purposeful or flagrant misconduct.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the district court deny Sinclair's motions to suppress statements (Docket # 47) and evidence of photographic identifications (Docket # 59). The hearing shall be continued on **November 20, 2012**, at **2:00 p.m.**, for the purpose of further developing the record on Sinclair's motion to suppress physical evidence seized from his garage on November 10, 2010. (Docket # 47).

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November   2  , 2012

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        November __2__, 2012

---

[4]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).