UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

DEVON SINCLAIR,

                    Defendant.

REPORT & RECOMMENDATION

10-CR-6211L

**PRELIMINARY STATEMENT**

By Order of Hon. David G. Larimer, United States District Judge, dated December 14, 2010, all pretrial matters in the above-captioned case were referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 67). Defendant Devon Sinclair ("Sinclair") has been charged with conspiracy to possess with intent to distribute and to distribute one hundred or more kilograms of marijuana, in violation of 21 U.S.C. § 846. (Docket # 1).

Currently pending before the Court is Sinclair's motion to suppress physical evidence. (Docket ## 47, 216). On June 3, 2011, this Court conducted an evidentiary hearing on the suppression motion. (Docket ## 81, 91). After the evidentiary hearing, this Court determined that an additional hearing was necessary to permit the Court to make a recommendation regarding the suppression of the physical evidence. (Docket # 197). That hearing was held on December 17, 2012 and, for the reasons discussed below, I recommend that the district court deny Sinclair's motion to suppress the physical evidence.

## FACTUAL BACKGROUND

### I. Procedural Background

The pending motion seeks suppression of evidence, including a bag of marijuana, that was seized during the execution of an arrest warrant for Sinclair on November 10, 2010. (Docket # 197 at 10). Sinclair argues that suppression is justified because the evidence was seized during a warrantless and unconstitutional search of his business premises. (*Id.* at 10-11). The government initially asserted two justifications for the seizures: first, that the marijuana was seized in plain view during the course of a lawful security sweep of the garage (*id.* at 11); and, second, that Sinclair voluntarily consented to a subsequent search of the premises, during which the other evidence (currency, records, cell phone and baggies) was seized and the marijuana would have inevitably been discovered had it not been seized during the earlier security sweep (*id.*).

Following an evidentiary hearing on June 3, 2011, this Court concluded that it was unable to make a recommendation regarding the suppression motion based upon the evidence elicited during the hearing. (*Id.* at 1). Specifically, the Court determined, based upon the testimony of Drug Enforcement Administration ("DEA") Special Agent Andrew Woeppel ("Woeppel"), that the bag of marijuana was discovered by another agent during the course of a legally permissible security sweep incident to Sinclair's arrest. (*Id.* at 15). After reviewing the evidence, however, the Court was unable to determine whether the bag of marijuana was in plain view when it was discovered. (*Id.* at 16-17). Woeppel's testimony revealed that he had not personally discovered the marijuana and could not provide sufficient information about the

location of the marijuana to allow the Court to make findings about whether the plain view exception applied. (*Id.*).

This Court determined that the record was also unclear as to whether the agents had informed Sinclair of the marijuana discovery prior to seeking Sinclair's consent to search his premises. (*Id.* at 17-18). As the Court reasoned, if the marijuana had been seized illegally, any exploitation of the seizure to obtain Sinclair's consent to search could invalidate the consent. (*Id.*).

The hearing was continued on December 17, 2012 to explore these open issues. (Docket ## 207, 208). At the hearing, Woeppel testified that he had provided inaccurate testimony in the earlier hearing about the discovery and seizure of the marijuana. (Dec. Tr. at 34-35).[1] As Woeppel admitted, he had testified at least three different times in the prior hearing that the marijuana was discovered during the course of the security sweep, prior to obtaining Sinclair's consent. (*Id.* at 37-41). In contrast, at the December 17, 2012 hearing, Woeppel testified that the marijuana was not discovered during the security sweep, but was located and seized during the later "consent" search. (*Id.* at 33).

As a result of Woeppel's inconsistent testimony, the government has withdrawn its argument that the marijuana was discovered in plain view during the course of a lawful security sweep. (*Id.* at 4). The government now maintains only that the marijuana was seized during a consent search. (Docket # 218 at 10).

Sinclair urges the Court to reject Woeppel's testimony in its entirety because of the material inconsistencies. (Docket # 216 at 3). Without it, Sinclair argues, the government

---

[1] The transcript of the December 17, 2012 hearing shall be referred to as "Dec. Tr. __." (Docket # 208).

cannot establish that Sinclair voluntarily consented to the search.  (*Id.*).  Alternatively, Sinclair

contends that his consent was not voluntary.  (*Id.*).


## II.  <u>June 3, 2011 Testimony</u>[2]

On June 3, 2011, Woeppel testified about Sinclair's arrest, the search of his

business and statements he made after his arrest.  (Tr. 6-34, 59-77).[3]  At that time, he had been

employed as an agent with the DEA for approximately six years.  (Tr. 5).  According to Woeppel,

on November 10, 2010, at approximately 9:30 a.m., he and an arrest team of approximately eight

agents executed an arrest warrant for Sinclair at his automobile mechanic business located at 207

Lyell Avenue in Rochester, New York.  (Tr. 6-7, 13, 59).  The premises consisted of two

adjoining spaces in one building – an open garage and an adjoining office.  (Tr. 60-61).  The

garage was small and contained two car lifts, vehicles, engine blocks, vehicle parts, and other

garage equipment and property.  (Tr. 10, 12, 61, 64).  Woeppel testified that many of the items in

the garage were large enough for an individual to hide in or behind.  (Tr. 10, 64).

With their guns drawn, Woeppel and the arrest team entered the premises through

a door that led into the open garage.  (Tr. 8-10, 60-61).  Upon entering the premises, the agents

quickly apprehended and handcuffed Sinclair, who was located just inside the door that the

officers had entered, in an area near the threshold between the office and the garage bay.  (Tr.

8-9, 60-61).  The agents immediately conducted an "initial sweep" of the garage.  (Tr. 9-10).  The

---

[2]  The recitation of testimony provided by Woeppel during the June 3, 2011 was set forth in this Court's November 11, 2012 Decision & Order and Report & Recommendation.  (Docket # 197).  The relevant portions of that recitation are set forth herein and have been supplemented with additional facts as necessary.

[3]  The transcript of the June 3, 2011 hearing shall be referred to as "Tr. __."  (Docket # 91).

purpose of the initial sweep, according to Woeppel, was to identify "any immediate threats – that could be people, dogs, booby traps, that kind of thing." (Tr. 10). Within seconds, the agents located and detained another individual who was between the two car lifts in the garage bay. (Tr. 8, 10, 62). The individual did not appear to have been hiding. (Tr. 62).

Immediately after detaining Sinclair and the other individual, the agents holstered their guns and began a "secondary" sweep by looking behind objects to determine whether any individuals were hiding in the garage. (Tr. 10-12, 63-64). Woeppel testified that the agents conducted this phase of the sweep in pairs and confined their search to areas where an individual could have been hiding. (Tr. 11-12).

Woeppel testified that during this second phase, another agent observed and seized a bag of marijuana. (Tr. 12, 65). According to Woeppel, the marijuana was resting on some open shelves or a red tool chest on the shelf. (*Id*.). Woeppel also testified that the marijuana was in plain view and could be seen from where the agents were positioned during the sweep. (Tr. 12-13). On cross-examination, however, Woeppel admitted that he was not certain where the marijuana had been located because he was not the agent who had recovered the marijuana. (Tr. 65-66).

Woeppel further testified that after the agents had completed the security sweep of the garage, he and DEA Special Agent Brian Hanley ("Hanley") introduced themselves to Sinclair and explained that they had a warrant for his arrest. (Tr. 13). At the time, Sinclair was in handcuffs and standing in the area where he had originally been detained by the agents. (*Id*.). The agents requested Sinclair's consent to "look around" the garage. (Tr. 13-14). Woeppel

testified that Sinclair verbally consented to the search. (Tr. 14). Hanley then presented a DEA "Consent to Search" form to Sinclair, which contained three pre-printed statements:

> 1.    I have been asked to permit special agents of the Drug Enforcement Administration to search: (Describe the person, places, or things to be searched.)
>
> 2.    I have not been threatened, nor forced in any way.
>
> 3.    I freely consent to this search.

(Tr. 14-15; G. Ex. 1).

Woeppel testified that Hanley explained the consent form to Sinclair. (Tr. 15-16). Woeppel completed the section identifying the area to be searched by handwriting the words "Pro Auto, 207 Lyell Avenue, Rochester, New York." (Tr. 16). Sinclair, Woeppel and Hanley each signed the form. (Tr. 17, 19). Woeppel testified that his request for consent did not identify any particular area of the premises they wished to search and Sinclair never told the agents that they could not search any specific area, including the office. (Tr. 66-67, 75-76).

According to Woeppel, the agents spoke to Sinclair in a conversational tone, and Sinclair was very cooperative and did not appear to be under the influence of alcohol or drugs. (Tr. 18, 20, 69). At no time did Sinclair indicate that he did not understand the agents' statements and questions. (Tr. 18). Woeppel testified that none of the agents made any promises or threats to Sinclair in order to obtain his consent. (Tr. 18-19). Following Sinclair's arrest, Woeppel transported him to the Rochester DEA office, where Woeppel and another DEA agent questioned him in an interview room, after advising Sinclair of his *Miranda* rights. (Tr. 24-29; G. Ex. 2).

After Sinclair executed the written consent form, the agents conducted a search of both the office and the garage. (Tr. 20). In the office, agents located and seized an unspecified amount of currency, documents and a cell phone. (Tr. 23). From the garage area, agents located and seized a number of small plastic bags. (Tr. 23, 70).

## III.  December 17, 2012 Testimony

During the subsequent hearing on December 17, 2012, the government recalled Woeppel. (Dec. Tr. 31). The government also called Hanley, who had discovered the bag of marijuana in Sinclair's garage. (Dec. Tr. 32).

### A.  Woeppel's Testimony

Woeppel testified that his prior testimony was inaccurate as to the timing of the marijuana discovery. (Dec. Tr. 35). According to Woeppel, when he met with Hanley and the prosecutor to prepare for the continuation of the evidentiary hearing, he determined that "there was a timing issue because there were many things going on at the same time[,] [a]nd th[e] transcript did not accurately reflect the timing of when we had Mr. Sinclair's consent [and] when the marijuana was found." (Dec. Tr. 35-37).

Specifically, Woeppel testified at the later hearing that after he had left the premises to escort Sinclair to the DEA office, he learned that marijuana had been discovered in Sinclair's garage. (Dec. Tr. 33). According to Woeppel, Hanley telephoned Woeppel after he had left the garage with Sinclair and informed him that marijuana had been found "out in the open in the garage of 207 Lyell Avenue." (*Id.*). Woeppel testified unequivocally that the marijuana was *not* discovered during the security sweep, but was discovered during the "consent"

7

search. (Dec. Tr. 33-35). Woeppel further testified that the security sweep was conducted at the same time – and not before – he and the other agents discussed consent with Sinclair and that the marijuana seizure was not discussed with Sinclair before obtaining his consent. (Dec. Tr. 33, 41).

### B. **Hanley's Testimony**

Hanley testified that he had been employed as an agent with the DEA for approximately eleven years. (Dec. Tr. 8). According to Hanley, he was the first agent to enter Sinclair's business to execute the arrest warrant. (Dec. Tr. 9). Hanley entered with his gun drawn and immediately observed Sinclair in his office. (Dec. Tr. 9, 12). Sinclair was advised that he was under arrest, was handcuffed and was led from the office into the adjoining garage area. (Dec. Tr. 10).

Hanley, Woeppel and a third DEA agent, Timothy Kernan ("Kernan"), explained to Sinclair that they had a federal arrest warrant for him and that he was under arrest. (Dec. Tr. 11). The three agents holstered their weapons after Sinclair was handcuffed. (Dec. Tr. 13, 27). According to Hanley, Woeppel asked Sinclair whether the agents could search the business for "guns, weapons, contraband and explosives." (Dec. Tr. 11). Sinclair verbally agreed. (Dec. Tr. 11-12). Sinclair was then asked if he would execute a consent form, and he again agreed. (Dec. Tr. 13, 29). At that point, Hanley removed the handcuffs from Sinclair's right hand to allow him to sign the form and then re-handcuffed Sinclair. (Dec. Tr. 13, 15, 29, 30). After he signed the form, he was transported to the DEA office by Woeppel and another agent. (Dec. Tr. at 15).

The entire garage encounter between the agents and Sinclair lasted approximately three minutes. (Dec. Tr. 29). According to Hanley, the agents spoke to Sinclair in a "normal"

tone and did not make any promises or threats to Sinclair to induce him to consent to the search. (Dec. Tr. 12, 14). Hanley testified that they never told Sinclair that they had a search warrant or that they could obtain one if he refused to consent. (Dec. Tr. 30). Nor did they inform Sinclair that he had the right to refuse to provide consent. (*Id.*). Hanley testified that the subject of marijuana was not discussed with Sinclair prior to obtaining his consent. (Dec. Tr. 14-15). Hanley could not recall whether *Miranda* warnings were administered prior to execution of the consent form. (Dec. Tr. 28).

After Sinclair left the premises, Hanley joined the other agents to search the premises. (Dec. Tr. 15). During that search, Hanley discovered a bag of marijuana located in a red toolbox. (Dec. Tr. 15-16). According to Hanley, he observed the bag resting in an open area of the toolbox. (Dec. Tr. 17-18).

## IV. Sinclair's Affidavit

Sinclair has submitted an affidavit stating that he consented to a search only of his office, but not any other areas of the garage and that he has no recollection of being advised of or waiving his *Miranda* rights. (Docket # 47-7 at ¶¶ 5-6, 13).

## DISCUSSION

### A. Inconsistencies in Woeppel's Testimony

A review of the testimony provided during the June and December evidentiary hearings reveals that Woeppel's testimony contains material inconsistencies regarding the timing of the protective sweep and the discovery of the marijuana. Woeppel clearly testified during the

June hearing that the marijuana had been found in plain view during the course of a security sweep of the premises. That testimony formed the basis of the government's reliance on the plain view exception in order to justify the warrantless seizure of the marijuana. In contrast, during the December hearing, Woeppel testified that the marijuana had been discovered by Hanley after the completion of the protective sweep and after Woeppel had left the premises with Sinclair in custody. Woeppel has conceded that his earlier testimony was inaccurate, and the government has withdrawn its plain view exception argument.

The first issue I address is Sinclair's contention that Woeppel's testimony contains such substantial inconsistencies as to render it unreliable in its entirety. I disagree. Unquestionably, it includes clear inconsistencies as to a material fact – whether the marijuana was discovered during the security sweep or the later "consent" search. In his December testimony, Woeppel explained that his previous inaccurate testimony derived from his confusion over the fact that Hanley told him that the marijuana had been discovered in the "open," which he had mistakenly interpreted to mean that it had been discovered in plain view during the security sweep. He further explained that he had realized his mistake for the first time when he met with the prosecutor and Hanley, and reviewed investigative reports, to prepare for the December hearing. While Woeppel's interpretation of Hanley's telephone call was precipitous, careless and ultimately baseless, I do not find that his explanation was incredible. That, of course, is a different issue.

At the December hearing, Woeppel testified unequivocally that his earlier testimony was inaccurate and that the marijuana had in fact been discovered during the search that was conducted after he had departed the premises with Sinclair. Woeppel credibly explained

why he had testified inaccurately at the earlier hearing. His unequivocal December testimony about the timing of the marijuana discovery and seizure is fully corroborated by the testimony of Hanley, who was the agent who actually found the marijuana during the post-sweep "consent" search. For these reasons, I find that Woeppel's December testimony is credible and that striking his testimony in its entirety is not warranted.[4]

To be clear, nothing in the record suggests that Woeppel intended to mislead the Court or that his testimony in this case is part of a larger pattern of misconduct. In addition, his inaccurate testimony has been corrected, and Sinclair has suffered no actual prejudice as a result of the earlier mistaken testimony. Under such circumstances, suppression of the marijuana, or a more extreme sanction of dismissal, would be inappropriate, in my estimation. *See*, *e.g.*, *United States v. Broward*, 594 F.2d 345, 351 (2d Cir.) (holding false statements in warrant affidavit did not warrant dismissal; "there is simply no need to thwart the public interest in prosecuting serious crimes unless the government misconduct is widespread or extraordinarily serious"), *cert. denied*, 442 U.S. 941 (1979); *United States v. Hidalgo*, 747 F. Supp. 818, 836 (D. Mass. 1990) (applying inevitable discovery rule to allow introduction of evidence where court concluded that officers' inconsistent testimony was not deliberately misleading); *United States v. Pirelli*, 650 F. Supp. 1254, 1265-65 (D. Mass. 1986) (dismissal is inappropriate where there is no ongoing prejudice and where there is no "pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness").

---

[4] Sinclair argues that other inconsistencies exist between Woeppel's and Hanley's testimony that counsel in favor of striking Woeppel's testimony. (Docket # 216 at 2-3). While I agree that some inconsistencies do exist, those inconsistencies do not materially affect the analysis of the issues presented in the suppression motion and, in any event, are not uncommon when two witnesses testify about the same course of events.

That said, the potentially serious consequences of Woeppel's inaccurate testimony, and the government's reliance upon it, cannot be minimized. The legal issue before the Court on this suppression motion is whether the warrantless seizure of the marijuana may be justified. The government advanced two theories in an effort to do so – the first was the plain view doctrine. That proffered justification turned entirely on Woeppel's testimony that the marijuana had been observed in plain view during the course of a lawful security sweep. Had this Court accepted his testimony as the government urged, without seeking further clarification, the seizure would have been upheld on factually and legally baseless grounds.

The government has an important ethical obligation to ensure that legal arguments that it advances, and asks the Court to rely upon, are factually grounded. It failed in its obligation in this case as a result of inexcusable carelessness in its motion practice. Although the error has been remedied through the supplemental testimony of Woeppel and Hanley, that correction only occurred because the Court ordered additional testimony be taken. Even after Woeppel's June testimony in which he admitted on cross-examination that he was not the agent who had seen and seized the marijuana, the government evidently did nothing after that hearing to verify that the plain view exception was justified by the facts. Nor, apparently, did the government reassess the factual basis for the proffered justification promptly after the Court issued its Report and Recommendation raising questions about the plain view exception. Indeed, the first time the Court learned about the inaccurate testimony was during the December hearing; Sinclair's counsel was only advised of it on the business day prior to the hearing – the same day of the meeting between Woeppel, Hanley and the prosecutor to prepare for the hearing. (Dec. Tr. 43-44).

12

Courts have the inherent supervisory authority to fashion appropriate remedies to redress governmental misconduct. *See United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000) ("[g]uided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress") (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)), *cert. denied*, 533 U.S. 953 (2001); *Daye v. Attorney General of State of New York*, 712 F.2d 1566, 1571 (2d Cir. 1983) ("federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts"), *cert. denied*, 464 U.S. 1048 (1984). The supervisory power promotes three goals: (1) "to implement a remedy for violation of recognized rights"; (2) "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury"; and, (3) "to deter illegal conduct." *United States v. Hasting*, 461 U.S. at 504. The supervisory power is limited and must be exercised with "restraint and circumspection." *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994). Thus, while "courts should be willing to 'consider invoking [their] supervisory powers to secure enforcement of better prosecutorial practice and reprimand of those who fail to observe it' . . . such powers must be used sparingly." *United States v. Santana*, 6 F.3d 1, 10 (1st Cir. 1993) (alteration in original) (quoting *United States v. Osorio*, 929 F.2d 753, 763 (1st Cir. 1991)). When exercising their power, courts must balance competing interests and select the most "narrowly tailored" means of promoting the goals implicated by the supervisory powers. *Hasting*, 461 U.S. at 505-06.

In this case, I find that the severe sanctions of suppression or dismissal of the charges are too extreme to be warranted by the materially false testimony, in view of my finding

that it was not *intentionally* misleading.  *Compare United States v. Gonzalez*, 719 F. Supp. 2d

167, 186-87 (D. Mass. 2010) (suppressing evidence by declining to apply inevitable discovery

exception where officers "deliberately testified falsely" during suppression hearing) *and United

States v. Rullo*, 748 F. Supp. 36, 44-45 (D. Mass. 1990) (refusing to apply inevitable discovery

exception where court concluded that officer "either fabricated answers . . . or knowingly

testified falsely" at suppression hearing) *with United States v. Hidalgo*, 747 F. Supp. at 836

(applying inevitable discovery rule to allow introduction of evidence where court concluded that

"while the testimony of several officers was inconsistent, the court regards such inconsistencies

to be the result of unimpressive confusion rather than as part of a deliberate effort to mislead").  I

do recommend, however, on the record before the Court that Sinclair should be permitted to

introduce evidence about Woeppel's materially inaccurate testimony should Woeppel be called

by the government as a witness at trial.  If Woeppel is not called as a government witness, I

recommend that the district court allow Sinclair to subpoena and cross-examine him if the

government offers the marijuana into evidence.  *See United States v. Broward*, 594 F.2d at 351

(holding dismissal inappropriate remedy for false testimony but noting that defendant would have

"substantial material with which to impeach important government witness if, in the face of such

impeachment material they testify at trial"); *United States v. Willock*, 696 F. Supp. 2d 536,

581-82 (D. Md. 2010) (recommending that the district court limit government's testimony at trial

as remedy for discovery violation), *aff'd*, 687 F.3d 207 (4th Cir. 2012), *cert. denied*, 133 S. Ct.

899 (2013).

B.  **Validity of Consent**

At this stage, the only proffered justification for the warrantless search and seizure of the evidence from Sinclair's business is Sinclair's consent to the search.  Thus, the legality of the search and seizure turns on whether Sinclair voluntarily consented to the search.  *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)).

It is well-established that a warrantless search is permissible if based upon the valid consent of a person authorized to provide consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996).  The consent need only be voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent.  *See Schneckloth v. Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

Voluntariness is determined based upon the totality of the circumstances.  *Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990).  Among the relevant considerations are:  age, education, background, physical and mental condition, the setting in which the consent was obtained, whether *Miranda* warnings were administered and whether the individual had knowledge of the right to refuse consent.  *See Schneckloth*, 412 U.S. at 226; *United States v. Kon Yu-Leung*, 910 F.2d at 41.  "Courts have also considered relevant factors such as 'whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained . . . and whether the defendant previously had refused to consent.'"  *United States v. Schaefer*, 859

F. Supp. 2d 397, 407 (E.D.N.Y. 2012) (quoting *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998)). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority," *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994), and the fact that it is obtained while the individual is in custody does not render it involuntary, *see*, *e.g.*, *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988), although it does "require more careful scrutiny," *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert. denied*, 429 U.S. 820 (1976).

The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981). "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).

Considering the totality of the circumstances, I find that Sinclair's consent to the search of his business premises was voluntary. Sinclair's verbal consent to the search occurred inside his business premises, while he was handcuffed, moments after eight agents entered the premises with their service weapons drawn in order to arrest him. Although those circumstances were undoubtedly intimidating, the record demonstrates that once he was taken into custody, the agents holstered their weapons and advised Sinclair that they had a warrant for his arrest. The record further establishes that the agents entered Sinclair's business premises at approximately 9:30 a.m. through an unlocked door, without the use of force. In addition, after speaking to Sinclair and requesting his verbal consent, the agents presented Sinclair with a written consent

form which they explained to Sinclair and asked him to execute. The form reflects that consent was given to search the entire business premises.

No evidence exists that the agents pressured Sinclair to execute the form through promises, threats or other coercive means. Indeed, the form that Sinclair signed contained the printed statement, "I have not been threatened, nor forced in any way." Although the record contains no evidence as to Sinclair's educational level, he was a middle-aged business owner who was plainly conversant in the English language. He did not appear to be intoxicated or injured, and the encounter occurred mid-morning at his garage. Although he was not specifically advised of his right to refuse consent, his authority to do so was implied from the statement on the form, "I have been *asked* to *permit* special agents of the [DEA] to search." (G. Ex. 1 (emphasis added)). Considering all these circumstances, I conclude that the government has established that Sinclair's agreement to permit the search was voluntary and valid. *See United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir.) (consent to search was valid where defendant gave consent after being arrested by six officers with their guns drawn, handcuffed and read his *Miranda* warnings; "[t]he fact that police drew their guns to effectuate the arrest does not necessarily establish coercion, neither does the fact that [defendant] was handcuffed"), *cert. denied*, 543 U.S. 949 (2004); *United States v. Crespo*, 834 F.2d 267, 269-71 (2d Cir. 1987) (holding consent voluntary even when made after officers displayed guns, arrested and handcuffed defendant), *cert. denied*, 485 U.S. 1007 (1988); *United States v. Wilson*, 2012 WL 6641492, *9 (S.D.N.Y. 2012) (defendant consented voluntarily despite being arrested, handcuffed, placed in back of patrol vehicle and not advised of *Miranda* rights because such conditions were insufficient to establish coercion and there was no indication of any coercive

action by police); *United States v. Solano-Fell*, 2010 WL 2572950, *2 (W.D.N.Y.) (consent voluntary where requested moments after defendant was arrested and prior to *Miranda* warnings and where there was no evidence that agents "used threats, coercion or trickery to obtain the consent"), *report and recommendation adopted*, 2010 WL 2572953 (W.D.N.Y. 2010); *United States v. Sylla*, 2010 WL 582575, *2-4, 9-11 (E.D.N.Y. 2010) (finding consent voluntary where approximately 12-14 agents arrived at defendant's house at approximately 6:15 a.m., performed a protective sweep of residence and handcuffed adult occupants, and where three agents spoke to the handcuffed defendant, requested his consent to search house, read a consent to search form to defendant and were uncertain as to when *Miranda* rights were provided to defendant); *United States v. Alcantara*, 2009 WL 4756491, *11-12 (S.D.N.Y. 2009) (consent voluntary where defendant verbally consented while handcuffed, consent was sought shortly after arrest and *Miranda* rights were not provided where there was no evidence of coercive activity and where defendant subsequently executed a consent form after receiving *Miranda* warnings and being advised of ability to refuse); *United States v. Ramirez*, 903 F. Supp. 587, 590-91 (S.D.N.Y. 1995) (defendant voluntarily consented to search even though consent was obtained shortly after defendant was arrested by officers with guns drawn where arrest was carried out quickly, officers had holstered their guns and defendant was provided *Miranda* rights).

The cases cited by Sinclair to support his argument that his consent was not voluntary are distinguishable on their facts. (Docket # 216 at 5). In *Mapp*, the officers forcibly entered the defendant's premises at 2:00 a.m. and immediately sought consent to search while their guns were still drawn. *See United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973). In contrast, in this case, the entry was not forcible, was conducted mid-morning, the agents had

holstered their weapons and they calmly requested Sinclair's consent to search. *Id.* (agents in *Mapp* sought consent "without taking even minimal steps to establish an atmosphere of relative calm and somewhat more conducive to the making of a knowing and intelligent decision"). In *Lewis*, the form of defendant's consent was "at best equivocal" and he attempted to lead the officers away from the location of his premises. *United States v. Lewis*, 274 F. Supp. 184, 188 (S.D.N.Y. 1967). Unlike the defendant in *Lewis*, Sinclair's verbal consent was unequivocal and was reaffirmed through his execution of the consent to search form.

The fact that Sinclair was in custody and in the presence of approximately eight agents does not render his consent invalid. *See United States v. Laidlaw*, 2010 WL 382551, *6 (D. Conn. 2010) ("[a]lthough being arrested by officers who have their weapons drawn is intimidating, 'the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness'") (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006)); *United States v. Matos*, 2004 WL 1638193, *13 (W.D.N.Y. 2004) ("[t]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search[,] . . . [n]or does the fact that there were numerous officers present when the consent was requested cause such consent to be invalid") (internal citation omitted). Further, the fact that Sinclair was not informed of his *Miranda* rights or explicitly advised of his right to refuse consent does not render the consent involuntary. *See United States v. Solano-Fell*, 2010 WL 2572950 at *2 ("the fact that the defendant had not been given his *Miranda* rights prior to giving his consent to search . . . does not impugn the voluntariness of the consent"); *United States v. Rojas*, 906 F. Supp. 120, 127 (E.D.N.Y. 1995) ("there is no requirement that a person be informed of his right to refuse in order for a consent search to be valid; a consent to search does

not have to be 'knowing' as long as it is voluntary") (citing *Schneckloth*, 412 U.S. at 234, 247-48).

## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny Sinclair's motions to suppress physical evidence.  (Docket # 47).

    *s/Marian W. Payson*
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
       May   10   , 2013

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                  *s/Marian W. Payson*
                    MARIAN W. PAYSON
                  United States Magistrate Judge

Dated: Rochester, New York
      May   10  , 2013

---

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).